NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1209
_____

BANCROFT LIFE & CASUALTY ICC, LTD.

v.

INTERCONTINENTAL MANAGEMENT LTD.,
a corporation that, upon information and belief,
is organized under the laws of St. Thomas (U.S. Virgin Islands),
d/b/a INTERCONTINENTAL CAPTIVE MANAGEMENT COMPANY, LTD.;
THE ROBERTS AND PATTON LAW FIRM,
upon information and belief, a Pennsylvania Partnership;
JOHN R. PATTON, ESQ., an individual resident of Pennsylvania;
GEORGE THOMAS ROBERTS, ESQ., an individual resident of Pennsylvania;
NIGEL BAILEY, an individual resident of St. Thomas (U.S. Virgin Islands);
CUNNINGHAM HUGHAN & COMPANY,
a professional corporation organized under the laws of Pennsylvania;
THOMAS HUGHAN, C.P.A., an individual resident of Pennsylvania;
INTERCONTINENTAL MANAGEMENT LTD, a corporation that,
upon information and belief, is organized under the laws of Pennsylvania

Intercontinental Management Ltd.;
The Roberts and Patton Law Firm;
John R. Patton, Esq.;
George Thomas Roberts, Esq.;
Nigel Bailey;
Intercontinental Management Ltd.,
Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-10-cv-00704)
District Judge: Honorable William L. Standish
_____

Before: FISHER, VANASKIE and ROTH, *Circuit Judges*.

(Filed: January 5, 2012)
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Intercontinental Captive Management Company, Ltd. ("ICMC"), Intercontinental

Management, Ltd., the Roberts Patton Law Firm, John R. Patton, Esquire, George

Thomas Roberts, Esquire ("Roberts"), and Nigel Bailey (collectively, "IM") appeal the

District Court's granting of Bancroft Life & Casualty ICC, Ltd.'s ("Bancroft") motion for

preliminary injunction, which ordered IM to return Bancroft's property, including its

corporate books and records, and to cease interfering in Bancroft's relations with its

incorporated cells. For the following reasons, we will affirm the District Court's order.

I.

We write principally for the parties, who are familiar with the factual context and

legal history of this case. Therefore, we will set forth only those facts necessary to our

analysis.

On October 15, 2004, Bancroft, an insurance company formed in the British

Virgin Islands, entered into an "Insurance and Taxation Services and Advisory

Agreement" ("Management Agreement") with ICMC, a corporation that offers

2

management and administrative services to international insurance companies. ICMC was not licensed to sell insurance, so Bancroft and ICMC were not competitors. Under the Management Agreement, ICMC agreed, among other things, to maintain complete books, records and accounts of Bancroft and to file all required reports to ensure that Bancroft complied with the laws of its domicile jurisdiction. The Management Agreement specifically provided that Bancroft would retain ownership of all books and records produced by ICMC in connection with its management of Bancroft.

In 2006, Bancroft relocated to St. Lucia. That same year, the International Insurance Act ("Insurance Act") of St. Lucia was amended to allow an international insurance company to offer a new line of business based on an incorporated cell company ("ICC"). The ICC is licensed to provide insurance and operates through a separate company called an incorporated cell ("IC"). In late 2007, Bancroft decided to offer insurance to United States companies using its ICC/IC model, which expanded ICMC's management responsibilities under the Management Agreement to include the formation and management of Bancroft's ICs. To better maintain its records, Bancroft and IM agreed to dedicate a computer server solely for Bancroft's records and installed an external hard drive and a Dell computer. In 2008 and 2009, ICMC and the Roberts and Patton Law Firm formed several ICs for Bancroft, including Joyce IC and CDG IC.

Dissatisfied with the management of IM, Bancroft decided to replace IM with CBIZ MHM ("CBIZ") and sent a memo to IM confirming the termination of the

3

Management Agreement on October 6, 2009. On December 10, 2009, Bancroft sent a letter to ICMC demanding the delivery of all Bancroft records to CBIZ. A week later, IM sent a letter to Matthew Brown ("Brown"), a tax attorney that referred business to Bancroft, stating that IM would "no longer be acting as the U.S. Manager for Bancroft." The letter specifically stated that ICMC "terminated [the] Management Agreement due to Bancroft's: (1) failure to pay on a timely basis several invoices for services previously rendered; and (2) decision to move to a new direction, which [IM] did not support." The letter was sent to other service providers, as well as the owners of Joyce IC and CDG IC. Brown informed IM that the letter created a panic among Bancroft's business associates. On January 5, 2010, Roberts scheduled a board meeting of Joyce IC and CDG IC without notifying Bancroft and proposed resolutions to transfer the registrations of Joyce IC and CDG IC to a competitor of Bancroft, the ostensible owner of which was the brother of ICMC's Vice President.

In March 2010, an audit of Bancroft by the St. Lucia Ministry of Finance ("the Regulator") for the year 2008 revealed non-compliance with the amended Insurance Act. Among other things, the audit revealed ICMC's failure to prepare semi-annual financial reports for Bancroft's ICs. Upon being notified of Joyce IC's noncompliance, the Regulator sent a letter stating that Joyce's failure to comply with the statute "will result in the enforcement of Section 21A" of the amended Insurance Act.

4

On May 21, 2010, Bancroft filed a civil action and later moved for a Temporary Restraining Order on June 24, 2010.  On July 7, 2010, Bancroft and IM entered into a consent TRO, which provides, among other things, that IM will not interfere with Bancroft's efforts to manage its ICs.  On January 13, 2011, the District Court granted Bancroft's motion for preliminary injunction, ordering IM to return Bancroft's property, including books and records, and cease interfering in Bancroft's relations with its ICs.[1]  IM filed a timely appeal.

## II.

The District Court had subject matter jurisdiction under 28 U.S.C. § 1332.  We have jurisdiction under 28 U.S.C. § 1291.  We review the District Court's "findings of fact for clear error, its conclusions of law *de novo*, and the ultimate decision to grant the preliminary injunction for abuse of discretion."  *Miller v. Mitchell*, 598 F.3d 139, 145 (3d Cir. 2010) (citation omitted).

---

[1] The District Court also denied without prejudice IM's motion for judgment as a matter of law.  Although IM argues that the District Court erred in denying its motion for judgment, we lack jurisdiction to review the District Court's order.  First, the District Court's order did not resolve any claims or issues, and the motion was denied without prejudice; thus, it cannot constitute a final order under 28 U.S.C. § 1291.  *See Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 438 (3d Cir. 2003).  Second, under 28 U.S.C. § 1292, we do not have jurisdiction to review the denial of a motion for judgment as a matter of law.  In addition, we do not have pendent jurisdiction because the preliminary injunction appeal can be resolved without reviewing the denial of IM's motion for judgment.  *See Am. Soc'y for Testing & Materials v. Corrpro Cos., Inc.*, 478 F.3d 557, 581 (3d Cir. 2007).

5

## III.

To grant a preliminary injunction, a district court must weigh and consider (1) whether the movant has shown a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the relief is denied; (3) whether granting relief will result in even greater harm to the nonmoving party; and (4) whether the public interest favors such relief. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir.2010). IM submits that the District Court erred in granting Bancroft's motion for preliminary injunction because Bancroft did not meet its burden of showing the four preliminary injunction factors. We disagree.

The District Court correctly granted Bancroft's request for a preliminary injunction with respect to the claim that IM should return Bancroft's property, including books and records, still in IM's possession. First, Bancroft showed a likelihood of success on its conversion claim. Under Pennsylvania law, conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n.3 (Pa. Super. 2000) (citation omitted). Despite IM's contention that it returned all records pertaining to Bancroft, the fact that Bancroft continued to receive records up to the time of the preliminary injunction hearing supports the District Court's finding that Bancroft still had not received many of its documents that should have been in IM's possession. And although IM denies that it

6

knows the password for the external hard drive and Dell computer, IM's use and possession of those devices since they were installed in early 2008 up until delivery to Bancroft was sufficient to establish a prima facie case that IM was interfering with Bancroft's property right to access its own records. *See Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).

Second, Bancroft established that it would suffer "immediate irreparable harm, or a presently existing actual threat of harm" if IM did not return records necessary for Bancroft's compliance with the amended Insurance Act. *Premier Dental Prods., Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 858 (3d Cir. 1986) (citation omitted). The Regulator's threat to take action against Joyce IC under Section 21A of the amended Insurance Act, which could include the cancellation of its registration as an IC in St. Lucia, was sufficient to satisfy the second preliminary injunction factor. *See Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1458 (3d Cir. 1994).

Third, preliminarily enjoining IM to turn over Bancroft's records would not result in an even greater harm to IM. IM argues that it would suffer irreparable harm because the injunction would deprive it of business income derived from its longtime clients, Joyce IC and CDG IC. However, "[w]e have long held that an injury measured in solely monetary terms cannot constitute irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.,* 562 F.3d 553, 557 (3d Cir. 2009) (citations omitted). Further, IM's management relationship with these Bancroft ICs existed due to IM's Management

Agreement with Bancroft. Because that Agreement has been terminated, IM has neither the right to manage Bancroft's ICs nor any use for the records of Bancroft pertaining to those ICs. Accordingly, IM would not suffer irreparable harm by returning Bancroft's books and records.

Fourth, given the likelihood of success on Bancroft's conversion claim, the preliminary injunction would protect Bancroft's property right to access its own books and records. We agree with the District Court that the public has a strong interest in protecting property rights. *See Minard Run Oil Co. v. U.S. Forest Serv.*, --- F.3d ---, 2011 WL 4389220, at \*14 (3d Cir. 2011).

The District Court also did not abuse its discretion in preliminarily enjoining IM from interfering with Bancroft's efforts to manage its ICs. First, Bancroft established a likelihood of success on its claims of tortious interference with existing or prospective contractual relationships, defamation, and breach of fiduciary duty. To prove a claim of tortious interference with contractual relationships, a party must prove there was (1) a contractual or prospective business relationship between the plaintiff and a third party; (2) purposeful conduct intended to harm an existing or prospective relationship; (3) the absence of privilege or justification on the part of the defendant; (4) damages resulting from the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference. *Acumed LLC v. Advanced Surgical Servs,. Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

8

There was a contractual or prospective business relationship between Bancroft and the ICs because St. Lucia law holds Bancroft responsible for the governance of its ICs and mandates an operating agreement between ICs and ICCs. The District Court's factual finding that IM purposefully acted to harm this relationship is supported by evidence that IM orchestrated the transfer of Bancroft's ICs to a competitor, in which IM retained an interest. Although competitors, in certain circumstances, are privileged in the course of competition to interfere with others' contractual relationships, *Acumed*, 561 F.3d at 214-15, IM and Bancroft were not competitors, so IM's interference was not privileged. Finally, IM's actions caused damage by hindering Bancroft from bringing its ICs into compliance with St. Lucia's amended Insurance Act.

Bancroft also established a likelihood of success on its defamation claim, which requires a plaintiff to prove "(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." 42 Pa. Cons. Stat. § 8343(a). The December letter IM sent to Bancroft's business associates as well as Joyce IC and CDG IC went far beyond notifying others of the termination of the Management Agreement. This communication by IM clearly applied to Bancroft and was defamatory in nature by ascribing conduct, such as the failure to honor financial

9

commitments, that would adversely affect Bancroft's business reputation. *See Beverly Enters., Inc. v. Trump,* 182 F.3d 183, 187 (3d Cir. 1999) (citation omitted) (holding statement is defamatory when it "tends so to harm the reputation of another"). Recipients of the letter understood the letter applied to Bancroft because one of the recipients, Brown, sent an email to IM indicating that the letter depicted Bancroft in a "very negative light." The letter also suggested that the statement created panic amongst Bancroft's business associates, resulting in special harm. And there was no evidence that IM's statement was privileged. Thus, the District Court properly concluded that Bancroft was likely to succeed on its defamation claim.

In addition, Bancroft established a likelihood of success on its fiduciary duty claim. Under Pennsylvania law, an agent "is considered a fiduciary with respect to matters within the scope of his agency and is subject to a duty not to act or to agree to act . . . for persons whose interests conflict with those of the principal in matters in which the agent is employed." *Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318, 322 (E.D. Pa. 1998). As Bancroft's managing agents, ICMC and its principals owed a fiduciary duty to Bancroft. "Fiduciary duty demands undivided loyalty" and "prohibits conflicts of interest." *Id.* (citation omitted). IM's actions, including the publication of damaging information regarding Bancroft and an attempt to transfer the registrations of Joyce IC and CDG IC to Bancroft's competitor, in which IM retained an interest, implicated

10

serious conflicts of interest and supported a finding that IM likely breached its fiduciary duty to Bancroft.

Bancroft suffered irreparable harm because IM's interference prevented Bancroft from ensuring that its ICs comply with St. Lucia's amended Insurance Act. IM will not suffer greater harm from the preliminary injunction; although ICMC introduced the owners of Joyce IC and CDG IC to Bancroft, ICMC was paid to develop business for Bancroft and has no right to interfere with Bancroft's business relationship with its ICs. Moreover, the injunction is also narrowly tailored and does not prevent IM from doing business with entities other than Bancroft ICs. Finally, preventing companies from interfering with another's existing or prospective business relations, especially when such interference involves defamation and breach of fiduciary duties, furthers the public interest. Thus, the District Court did not abuse its discretion in granting Bancroft's motion for a preliminary injunction.

## IV.

For the foregoing reasons, we will affirm the order of the District Court.

11